POWERS MERCANTILE CO. et al. v. OL-
SON, Governor of Minnesota, et al.

**LA BELLE SAFETY STORAGE CO. et al.
v. SAME.**

Nos. 2775, 2776.

District Court, D. Minnesota,
Fourth Division.

Aug. 11, 1934.

Boutelle, Bowen & Flanagan, Stinchfield, Mackall, Crounse, McNally & Moore, Levy & Dretchko, Mark J. Woolley, and James E. O'Brien, all of Minneapolis, Minn., for plaintiffs.

Floyd B. Olson, Governor, Lieut. Col. Frederic D. McCarthy, Major John H. Hougen, Lieut. Peter S. Rask and Lieut. Arthur M. Clure (Harry H. Peterson, Atty. Gen., and Matthias N. Orfield, William S. Ervin, and Roy C. Frank, Asst. Attys. Gen., on the brief), for defendants.

Before SANBORN, Circuit Judge, and MOLYNEAUX and NORDBYE, District Judges.

PER CURIAM.

By consent of the parties, these causes, which involve the same questions and arise out of the same state of facts, were presented and argued together. They are suits to enjoin the Governor and the other defendants from interfering with the movement of motortrucks owned and operated by the plaintiffs.

Since it appears that the plaintiffs seek to enjoin the defendants, who are officers of the state, from doing what they claim they are authorized and required to do by the Constitution and laws of the state, the causes are properly to be determined by a statutory court under the provisions of section 380, title 28, U. S. C. (28 USCA § 380).

A prompt decision of these cases is more to be desired than an elaborate opinion, and we shall state as briefly as possible our conclusions.

The situation out of which this controversy arises is briefly as follows: In May of this year disagreements arose in Minneapolis, Minn., between certain truck drivers, members of a union known as Local No. 574, and their employers. This resulted in a strike. The strikers were well organized, and they, together with their sympathizers, many of whom apparently came from outside of the city to assist them, undertook, by force and violence, to prevent the movement of trucks in the city of Minneapolis. The local police attempted to restore law and order. There was much violence. Two special deputy police were killed by the strikers, many persons were wounded, and the police and local authorities were unable to cope with the situation.

On May 23, 1934, the superintendent of police of Minneapolis and the sheriff of Hennepin county requested of the Governor the aid of the military forces of the state to preserve law and order in the county of Hennepin and the city of Minneapolis. On the same day the Governor authorized the adjutant general to use such portions of the Minnesota National Guard as he might consider necessary to assist the civil authorities of the county and city in maintaining law and order. The adjutant general thereupon called out such troops as he deemed necessary and went to the aid of the local authorities. Shortly thereafter, an agreement of settlement was reached by the employers and employees, and the troops were withdrawn. There was no further outbreak of violence in the city until July 16, 1934, at which time Local Union No. 574 declared another strike.

The mayor of Minneapolis and the sheriff of Hennepin county, on July 17, 1934, again requested the Governor for the aid of the military forces of the state in preserving law and order in the city and county, on the ground that the local civil authorities were unable to control the situation. The affidavit of the Governor, on file herein, states that the sheriff informed him that he did not desire that the troops be placed under the sheriff's direction, but desired that such troops take absolute control of law enforcement in the county of Hennepin. On the same day, in response to this request, the Governor issued an executive order directing the adjutant general to utilize such portions of the National Guard as were deemed necessary to aid the civil authorities. In compliance with the Governor's order, the adjutant general assembled in the Minneapolis Armory a battalion of state troops.

On July 20, 1934, a number of the city police, who were convoying a truck, came into collision with a group of strikers attempting to prevent the movement of the truck. The police fired upon the strikers, wounding a number of them and causing the death of two.

During this strike period, general trucking and cartage business was virtually at a standstill, and no trucks were moving except such as the strikers permitted to move and those which were convoyed by the police. Various attempts were being made to settle the differences between the strikers and their employers. A federal labor mediator, a federal labor commissioner, and the Governor himself conducted a series of conferences looking toward an adjustment. Finally the federal mediators proposed a plan of settlement, which has been referred to as the "Haas-Dunnigan proposal." This apparently was satisfactory to the employees, but unsatisfactory to the employers.

On July 26, 1934, the Governor issued a proclamation declaring that a state of martial rule existed in the city of Minneapolis, the county of Hennepin, and certain adjacent territory. In this proclamation, the adjutant general was directed to utilize the military forces of the state to restore law and order in the area affected. Brigadier General Walsh, adjutant general of the state, was designated as troop commander of the area. He accepted the assignment, and promulgated certain rules and regulations for the conduct of the inhabitants and the business and industry in the affected area, and called a number of the state's military organizations to his assistance. Since that time the policing of the area has been under the direction and control of the military authorities of the state. Certain trucks have been permitted to use the streets without permits from the military authorities, and others have been required to have permits.

The Governor issued an executive order, effective August 6, 1934, directed to Brigadier General Walsh, reciting, among other things, that it was necessary, for the preservation of law and order, not only to arrest and imprison those committing acts of disorder, but also to remove the causes for the perpetration of acts of disorder, and, in order to prevent disorder and adequately protect the citizens of Minneapolis, to restrict the movement of certain vehicles therein in such a manner as not to unduly interfere with the safety and convenience of the citizens. In this order the Governor specified what vehicles could move without permits and what vehicles could move with permits. The order states that permits will be issued by the troop commander to cover, among others, the following class of vehicles, and no others: "(5) Vehicles owned and/or operated by employers who subscribe to and agree to be bound by the so-called Haas-Dunnigan proposal (copy of which is posted in the office of the troop commander), and/or such modifications thereof as may in the future be agreed to between such employers and the representatives of their employees."

The plaintiffs in these actions are corporations which, in connection with their business, own and operate trucks. They have paid the license fees entitling them to operate such trucks on the streets of Minneapolis and the highways of Minnesota. They have not subscribed to the Haas-Dunnigan proposal; hence they have not received permits from the military authorities, and are not permitted to operate their trucks. Their claim is that the defendants, by refusing them permits, have discriminated against them and have deprived them of rights guaranteed them by the Constitution of the United States, and they ask for preliminary injunctions which will have the effect of restoring to them the rights of which they claim to have been unlawfully deprived.

The defendants, aside from the Governor, are officers of the military establishment of the state. They have obeyed the orders of the Governor, who is their commanding officer, as in duty they were bound to do.

Stated briefly, the position of the Governor is, in substance, this: That, in order to perform the duties imposed upon him by the state Constitution, art. 5, § 4, which provides: "He (the Governor) shall be commander-in-chief of the military and naval forces, and may call out such forces to execute the laws, to suppress insurrection, and to repel invasion. * * * He shall take care that the laws be faithfully executed, * * *" it was necessary for him to call out the state troops, and to do all of the acts and things which he has done, in order to suppress violence and to restore law and order in the area affected; that his determination of the necessity for calling out the troops, for the declaration of martial rule, and the means and methods which he has adopted for restoring law and order are not subject to review by the courts, since such matters must necessarily rest entirely in his discretion as the chief executive of the state of Minnesota.

The position of the plaintiffs, briefly stated, is: That, as citizens of the state of Minnesota and of the United States, they have a right to the use of the streets of Minneapolis and the highways of the state in the conduct of their lawful business; that the Governor's orders with respect to the issuance of permits have no reasonable relation to the restoration of law and order in the city of Minneapolis; that his proclamation of martial rule and all acts done thereunder exceed any authority with which he is clothed by the Constitution and laws of the state, and constitute a usurpation of power not granted to him; and that this court should, under the circumstances, enjoin him and the other defendants from in any way restricting the rights of the plaintiffs in the operation of their trucks.

The following propositions, we think, must either be conceded or regarded as fairly well established: That the Governor, as the chief executive officer of the state, is charged with the duty of seeing that its laws are executed, and is authorized, in the performance of that duty, when in his judgment the exigencies of the situation require, to use the

military forces of the state; that his judgment as to the necessity of using the troops to execute the laws is conclusive and not subject to review; that, when there is a breakdown of law and order in a community, and it therefore becomes necessary to use the state troops, the means which are employed to restore law and order must necessarily be left largely to the discretion of the Governor and the commanding officer of the troops; and that, within the range of the Governor's permitted discretion, his acts are not subject to the regulation or control of the judiciary. Arbitrary and capricious acts of the Governor, and those having no relation to the necessities of the situation, may be enjoined by the courts, as any clear abuse of power by an executive may be enjoined.

▇ Whether in the state of Minnesota there can be martial law or martial rule, in the sense of government by executive edict rather than law, while the courts are open and while the civil authorities are still functioning, although unable adequately to cope with an outbreak of violence, is a question, the final determination of which must rest with the Supreme Court of Minnesota. In the absence of the determination of that question by that court, we are not prepared to say that the Governor does not have that right under the Constitution and laws of this state.

▇ Under military rule, constitutional rights of individuals must give way to the necessities of the situation; and the deprivation of such rights, made necessary in order to restore the community to order under the law, cannot be made the basis for injunction or redress.

▇ We are of the opinion that in these cases we may inquire whether there was any justification for the Governor's act in requiring the military authorities to take charge of Minneapolis, and whether the means which he has employed have any relation to the duties imposed upon him by the Constitution and laws of the state and by the necessities of the situation.

▇ The problem with which we are confronted is an intensely practical one. The affidavits which have been presented clearly indicate a condition during the strike period of May and the strike period of July with which the civil authorities were unable to cope. Special deputies were struck down, and beaten after they were unconscious, in the presence of uniformed policemen, who could not, on account of the mob, assist them or arrest the offenders. Truck traffic was at a standstill. Automobiles of persons who were engaged in procuring food for themselves and their families were in some instances stopped by strikers. These cars were searched and the food was taken. The protection of life and property was entirely inadequate. The situation clearly called for the intervention of the military forces of the state, at least to assist the civil authorities, and, in view of the affidavits of various military officers and others as to the conditions of mob violence, actual and threatened, that existed in Minneapolis in the months of May and July, 1934, we do not believe that on this record we would be justified in invalidating the Governor's proclamation of martial rule.

▇ The Governor has come before this court and has filed his affidavit, under oath, and has stated in open court that all of the acts and things which he has done, he has, in good faith as Governor and commander of the military forces, considered to be necessary in order to restore law and order in the affected area; that it has been necessary for him to limit the number of trucks operating upon the streets of Minneapolis, because he could not protect all the trucks. There is no evidence to the contrary. He asserts that, if the trucks which, under his orders, cannot be permitted to operate on the streets, do operate, there will be outbreaks of violence which his troops will be unable to control and which will affect the safety of the entire community. The assertion by the plaintiffs that the Governor is using his powers for the purpose of coercing them into a settlement of their controversy with the strikers he denies. The Governor has stated in open court that, if the courts assume to interfere with him in the policing of the city, he will consider himself relieved of any further responsibility, or will be forced to take the position that the courts have exceeded their jurisdiction and that any injunctional order which they may issue is void.

We are of the opinion that there is substantial foundation for plaintiffs' belief that the Governor is using his powers for the purpose of coercing them into an acceptance of the Haas-Dunnigan proposal, and there is nothing in the situation as it has been presented to us which indicates that a timely order directing the adjutant general to use the military forces of the state in assisting the civil authorities in Minneapolis to restore law and order in that community, and to see that all persons who were lawfully entitled to use the streets and highways of the city should be protected from mob violence and unlawful acts, would not have accomplished all or more than has been accomplished by

martial rule. During the entire history of the state, so far as we are advised, no chief executive has ever before found it necessary to declare martial rule or to do more than assist the local authorities in times of emergency. However, the duty of enforcing the laws in Minneapolis, under the circumstances, was a duty which rested upon the Governor and not upon the courts. The responsibility was his responsibility. We must recognize that he has wide discretion in determining the means to be used in the restoration of law and order. While there are limits to his discretion, we do not feel justified upon these applications for preliminary injunctions in making a finding that in issuing his proclamation and orders he has so utterly disregarded his duties as Governor and commander in chief of the military forces of the state as to have been influenced solely by the desire to coerce the plaintiffs into the acceptance of a settlement which they consider unreasonable and which they were under no legal obligation to accept. To justify a court in finding, where lawlessness and violence have made the presence of troops necessary, that the commander in chief of the troops is violating his oath and prostituting his office to a purpose which has no relation to the restoration of law and order, there must be clear and convincing proof.

Military rule is preferable under almost any circumstances to mob rule. The Governor must bear the entire responsibility for the type of protection that he is affording to the citizens of Minneapolis and Hennepin county. The federal courts have no troops at their command and cannot police the city. It is suggested that, if the Governor should withdraw his protection from the people of Minneapolis, which this court is powerless to prevent, the federal government could, and probably would, furnish troops. However, there is no assurance that that would be done, and much violence and bloodshed might result before any assistance could be obtained from the federal government. Furthermore, there is no showing that the civil authorities in Hennepin county are now any more capable of maintaining law and order than they were before the military forces came into the city. The situation, while deplorable, justifies due caution in the issuance of any preliminary injunctions which might result in a more serious breakdown of government than has yet occurred. After due reflection and consideration, we are not prepared to find, upon the showing made before us, that the Governor's orders have no relation whatever to the necessities of the situation with which he is confronted and fall entirely outside the range of his discretion. While we may personally disagree with the Governor as to the manner in which he has handled the entire situation, that will not justify nor permit the relief prayed for.

Therefore, in harmony with the views herein expressed, it is our conclusion that the applications for preliminary injunctions must be denied, and it is so ordered.